# Richmond

LUCILLE WHITE, GUARDIAN, ETC. V. MABEL G. WHITE.

October 9, 1944.

Record No. 2866.

Present, All the Justices.

The opinion states the case.

*I. M. Quillen,* for the appellant.

*Burns & Lively* and *Joseph E. Duff,* for the appellee.

SPRATLEY, J., delivered the opinion of the court.

This proceeding involves the construction of the will of W. M. White, deceased. The testator died in 1931, possessed of four hundred and thirty-six acres of land in Russell county, and a small amount of personal property.

He left surviving him his widow, Mabel G. White, the appellee, and four sons and two daughters. After devising to his son, Gorman, and his daughter, Clara, a farm containing one hundred and forty-seven acres for their natural lives, with remainder to their respective heirs, he disposed of the residue of his property by the following language:

"Fourth, it is my will and desire, and I do hereby devise my home tract of land, containing about 289 acres, to my beloved wife and my other children, in the following manner: I want the mansion house and 60 acres of land around it to be laid off to my son, Arnold B. White, which I devise to him as his share of my real estate and which is to be held by him for his natural life and then it is my will that the remainder, after his death, go to his legal heirs. In laying off this tract of land to Arnold I do not want the improvements to be considered one way or the other.

"It is my will that the rest of my said farm be divided among my other children, namely, Hubert, Buford, and Mary R. White, and to go to them for their natural lives and at their deaths to their respective heirs, according to quality, quantity and value, after the dower is laid off to my beloved wife, no part of which is to be deducted from the *seventy* acres devised to Arnold. The said dower to be laid off out of the residue of my farm after Arnold's 60 acres are laid off and my wife's dower in said residue to be laid off adjoining said 60 acres devised to Arnold. I want my wife to have a home at the mansion house with Arnold, as long as she remains my widow and I also want my daughter, Mary R. White to have a home there as long as she is single and cares to make it her home.

"I further bequeath unto my beloved wife such of my household and kitchen furniture as she may desire to take and keep, and all the rest and residue of my personal estate I wish divided amongst my children and widow according to the statute of distribution and descent."

At the death of W. M. White, his son, Arnold, then twenty years of age, was unmarried. Arnold married Lucille White on September 17, 1932, and they immediately

established their home at the mansion house on the land devised to Arnold. At that time Mabel White, Buford White and the latter's wife, who is a sister of the appellant, and Mary White were also living at the mansion house. Mary was married in 1932, and established her home elsewhere. Buford White and his wife removed from the mansion house about three years later.

On April 5, 1937, a son, Orville Brown White, was born to Lucille and Arnold White. Arnold White contracted an illness in 1939, which resulted in his death on September 19, 1942, at the age of thirty-one years. He was survived by his widow and the above-named son.

Lucille White is thirty-seven years of age. Mabel White is sixty-four years old.

After the will was probated, the land was divided in accordance with its provisions, among the widow and the children. One hundred and thirty-seven acres, adjoining the sixty-acre tract devised to Arnold, were laid off and assigned to the widow as her dower.

Sometimes before Buford White and his wife removed from the mansion house, bickerings and quarrels had arisen between Lucille White and Mabel White as to their respective rights and privileges in the home. Their personal relations progressively became very bitter and acrimonious. Finally Lucille White established her apartment in the upstairs part of the mansion house and her mother-in-law lived on the first floor. Shortly thereafter Mary Brown, an aunt of Lucille White, came to live with her niece, and the unpleasant relations between Mabel White and Lucille White became more bitter and hostile than ever before.

After Arnold's death in 1942, Mabel White, on the advice of her physician, went away for a rest, visiting two of her sons for two or three months. When she returned the controversy between her and Lucille White was resumed, each insisting upon the right to occupy the downstairs portion of the house. Efforts to effect a peaceful and satisfactory solution failed, resulting in the institution of this suit.

On February 1, 1943, Mabel White filed her bill against Lucille White, Mary Brown, and Orville Brown White, in which she alleged that, under the will of her late husband, she had the right to the exclusive possession of the mansion house, and alleged that she had been deprived of that right by the unfriendly action and conduct of Lucille White and Mary Brown. She prayed that Lucille White and Mary Brown be required to vacate the mansion house; that she be granted the care and custody of the infant, Orville Brown White; and that the will of W. M. White be construed by the court and the rights of all parties in interest be ascertained and established.

Lucille White, in her own right and as guardian of her infant son, answered and asserted her claim, as guardian of the infant, to the complete and exclusive possession of the mansion house, and alleged that Mary Brown resided there at her request as the friend and helper of herself and infant son.

The formal answer of the infant defendant by his guardian *ad litem* was duly filed. Lucille White, as next friend of the infant, further filed a cross-bill praying that the title to her ward's estate be quieted in the suit.

Mary Brown filed her answer denying that she had any interest whatever in the subject matter of this litigation aside from her natural concern for the welfare of her niece and the infant, Orville Brown White.

On February 18, 1943, the court denied the prayer of Mabel White for a temporary injunction, and after hearing one witness *ore tenus*, continued the cause and directed that the remainder of the evidence be taken by depositions. A large volume of evidence was thereafter taken, which disclosed the unhappy personal relationship between the parties, Mabel White and Lucille White.

Each accused the other of insulting and discourteous conduct, and of behaving in a contentious and overbearing manner. The question whether their respective rights in the home were equal or superior constantly arose. Mrs. Mabel White, her children, and her neighbors charged Mary

Brown with hostile and unfriendly conduct and with inciting Lucille White to carry on the conflict with Mabel White and the brothers and sisters of Arnold White. A number of witnesses testified that Mary Brown created trouble wherever she went. Mrs. Buford White, a sister of Lucille White, and the niece of Mary Brown, charged the latter with being responsible for the actions of Lucille White. Mary Brown denied the conduct attributed to her, and said she was present in the house merely to assist and aid her niece in housekeeping and in the care of Orville. A nephew, a brother, and a sister of Mary Brown gave her a good name for orderly conduct.

A further statement of the details would serve no useful purpose. It is sufficient to say that hostility between the parties is so strong and bitter that no one has been able to reconcile their differences, and counsel agree that they are apparently irreconcilable.

On October 8, 1943, the trial court decreed that Orville Brown White, under the last will and testament of W. M. White, deceased, was invested of a fee simple estate in the mansion house and sixty acres of land, "subject, however, to the right of Mabel White to have a home, use and live in said mansion house along with her grandson, Orville Brown White, as her home, during her natural life, or so long as she remained the widow of the said Wm. M. White, together with the right to a reasonable use of the yard and curtilage around said mansion house as to afford her a reasonable convenient home in which to live as aforesaid."

The court then, expressing its opinion that while the mansion house was sufficiently spacious to provide a convenient home for those entitled to jointly occupy it but for the estrangement between them, referred the cause to a commissioner in chancery to ascertain, after due hearing, whether considering the size of the house, its condition, and facilities, it would be practical, expedient, and advisable to set apart and assign to the parties certain rooms, hallways, and spaces for their separate use and occupation respectively, and if

any such hallways or other spaces should and could be used jointly.

The commissioner accordingly heard a considerable amount of evidence, the major portion of which has little bearing upon the issues of the case. He reported that, in view of the hostile attitude of the parties towards each other, it could not be anticipated that they could live in the same house in harmony, under any agreement that could be suggested by him.

The trial court, after considering the commissioner's report, entered its final decree on March 21, 1944. This decree found that the mansion house was amply sufficient to provide a home for Mabel White, Orville Brown White, and his guardian and mother, Lucille White; that on account of the feeling between Mabel White and Lucille White it was impracticable for them to jointly occupy and use the house as a home; that the bitter feeling between them had been aggravated, incited, and kept alive by the conduct and presence of Mary Brown in the house; and, that although the house did not readily lend itself to division into two apartments, it was necessary and advisable, under the circumstances, to so divide it to carry out the true purpose and intent of the testator, W. M. White, deceased, assigning one apartment to Mabel White and the other to Orville Brown White and his guardian.

It was then decreed that one apartment consisting of a bedroom, dining room, and kitchen on the first floor, on the west side of the house, and the upstairs front room on the east side be assigned to Mabel White, for and during her widowhood, as a home for herself, and that the other apartment consisting of the downstairs front room on the east side of the house and the three rooms in the upstairs on the west side of the house should be assigned to Orville Brown White and Lucille White, guardian. It then proceeded to give to each party the common use of all hallways, staircases, porches, bathroom, water fixtures and appliances, with the right to use the yard immediately around the mansion house and the spring and the spring house, requiring that each of

the parties in so using the said premises, places and appliances should not unduly interfere with or hinder the right of the other to a reasonable use thereof.

The garden was ordered divided into two equal parts, and one assigned to each of the parties. Certain privileges were given to Mabel White to use designated outbuildings. Mary Brown was enjoined from using the mansion house as her home and place of residence, and Mabel White was enjoined from permitting any of her children to use the house as a place of residence; but it was provided that Mary Brown and the children of Mabel White should have the privilege of visiting the respective parties in the mansion house at reasonable times for reasonable periods.

From this decree Lucille White, guardian and next friend of Orville Brown White, the infant, has appealed. Neither Lucille White, individually, nor Mary Brown is a party thereto, although they were parties to the original suit. The issues are, therefore, confined to the respective rights of Mabel White, her infant grandson, and Lucille White, guardian.

The issues center around the legal effect of the testator's words, "I want my wife to have a home at the mansion house with Arnold, as long as she remains my widow."

The appellant contends that the words "with Arnold" have a clear meaning, limiting such rights as were given Mabel White in the mansion house to the duration of Arnold's life estate, and that the words "to have a home" are too vague and uncertain to impose a burden upon the fee simple estate devised to the infant.

When the language of a will is clear and unambiguous, it needs no interpretation. It speaks for itself. It is manifest that the words in the provision under review here are not without some ambiguity. When the meaning of the language used by a testator is questionable or uncertain, it is the duty of the court to ascertain and effectuate his intention. The rules governing the interpretation are not in dispute. The intention of the testator is to be gathered from the entire will and all of its provisions considered together,

rather than from a particular form of words or language employed in a single sentence, clause, or phrase. *Smith* v. *Cockrill*, 170 Va. 423, 196 S. E. 681, and cases cited.

As Mr. Justice Browning aptly and crisply said in *Farmers Bank* v. *Kinser*, 169 Va. 69, 192 S. E. 745, "The intention of the testator, if it can be perceived, is the key that unlocks the door to every will," and in *American Nat. Bank, etc., Co.* v. *Herndon*, 181 Va. 17, 23 S. E. (2d) 768, "The crucial, vital, focal thing is the intention of the testator. When we have that the quest is ended."

See also Vol. 6 (Permanent Supplement) Va. & W. Va. Reports, (Michie) Wills, pages 170, *et seq.*, and Vol. 19, Va. & W. Va. Digest (West) Wills, pages 159, *et seq.*, and cases cited.

Webster's International Dictionary (2d Ed.) Unabridged, devotes more than a column to the definition of the preposition "with." The first definition is: "In general, *with* denotes a relation of proximity, contiguity, or association."

The evidence discloses that there was no house fit for a home or dwelling place on any other part of the two hundred and eighty-nine acre farm. The will gave to Arnold and his heirs the sixty acres on which the mansion house was located. Although his share was the most valuable portion, the improvements thereon were not to be considered in laying off the tract to him, and the dower was required to be assigned out of the residue of the land. The dower was required to be assigned next to the sixty-acre tract on which the mansion house, her designated home, is located. The testator further gave to Mabel White "such of my household and kitchen furniture as she may desire to take and keep," all of which was contained in the mansion house, the home provided for her.

The testator manifested a completely natural desire for the wife of his bosom to have a home, with necessary furniture, after his death, a home provided by him as long as she remained his widow, and the foregoing provisions all testify to that desire. He gave Arnold a greater share in his

estate than his other children, but he burdened it with the provision for his widow. The words "with Arnold" merely and additionally identified and described the place where she was to have her home. It denoted the relation of the rights of the widow and her son, Arnold. The tenure of her right was not limited to the life of Arnold, but by the period during which she remained the testator's widow.

None of the cases cited in the briefs of counsel is helpful or persuasive, save as to the general principles of construction, since each case depends largely upon the particular language used, and its relation to the subject matter of the context wherein it is employed.

Under the rule stated, we have no difficulty in reaching the conclusion that it was the intention of the testator to provide a home in the mansion house for Mabel White as long as she remained his widow. This home happened to be the same property which had been devised to Arnold for his life, and consequently she was given a home "with Arnold" in the sense that Arnold had his home there also. The testator never knew his grandson, nor Lucille White as his daughter-in-law.

To interpret the will otherwise would result in ignoring the words "as long as she remains my widow." The language used and the provisions made definitely negative the contention that it was the intention of the testator that such right was to be terminated upon the death of his son, either one day or eleven years subsequent to the death of the testator.

This brings us to the second contention that the language of the provision for the widow is not sufficiently implicit to impose a limitation upon the estate devised to Arnold and his heirs.

It is impossible to formulate a comprehensive definition of the word "home." 40 C. J. S., page 418. It has many implications. It has been immortalized in song and story. Men and animals have an instinctive idea of its meaning. The toddling infant knows a yearning for the place which

he conceives to be his home. Domestic animals instinctively yield to the longing to return to their abiding places.

The implication of the words "to have a home," as used in the will under review and considered in connection with all of its provisions is definite and distinct. Considering the situation of the testator, the circumstances faced by him, the purpose sought to be accomplished by him, and his expressed concern and devotion for the welfare of his widow, it may be fairly said that he clearly intended to provide for her a dwelling place or shelter.

The appellant next contends that the court infringed on the rights of the infant in enjoining Mary Brown from making her home at the mansion house. There is ample and preponderating evidence supporting the finding of the trial judge that the bitter feeling between Mabel White and Lucille White has been "to some extent at least, engendered and kept alive by the presence and residence of Mary Brown in said home." Therefore, for that reason and for the reasons hereinafter stated, we find no error in the decree which forbids Mary Brown using the mansion house as her home or residence during the widowhood of Mabel White, while permitting her to visit the portion of the house occupied by Orville Brown White and Lucille White, guardian, at reasonable times and for reasonable periods.

Appellant further contends that Mabel White has been assigned more of the mansion house than is necessary to provide her with a home. Mabel White assigns cross-error to the failure to grant her more extensive rights.

Each of the parties, Mabel White, Orville Brown White, and Lucille White, has the right to occupy the mansion house as their respective homes. Each has the right to enjoy that benefit in peace and without molestation from the other, or from friends or associates of the other.

Each party blames the other for causing the trouble. There is evidence to indicate that both of them were offenders. That explains the trial court's decree with respect to the future conduct of each. However, the admissions of Lucille White disclose that she was the party least disposed

to arrive at a peaceful solution. Mabel White says that she is willing to try to live in peace and harmony in the mansion house with her daughter-in-law, although she believes it to be impracticable. Lucille White says that she is unwilling to attempt that association because it would lead only to endless bickerings and quarrels. Counsel make no suggestion, save that exclusive possession be given to such of the persons as they respectively represent.

The mansion house is a large two-story brick structure, erected around one hundred years ago, and situated remote from a town, on a secondary highway in Russell county. It is badly in need of repairs. There are eight main rooms in the dwelling, four upstairs and four downstairs. There is a front porch on the first floor, a front hall and a large back porch, and a bathroom. The second floor is practically the same as the first floor, except there is no bathroom. There is a stairway in the front hall leading from the first floor to the second floor. There is also a stairway on the first floor back porch leading to the second floor back porch. Domestic water is conveyed through a small pipe by gravity from a spring which arises in the mountains about a mile from the house. There is no water supplied to the second floor. The water pipe is in bad condition, and partly laid above the surface of the ground. Each room is heated by an open fireplace or stove. There is no electricity or telephone. The community is agricultural and there is no demand to rent the house. Its annual rental value is fixed at $120. There are certain small outhouses, barns, and cow sheds also badly in need of repair.

After a consideration of all the evidence, we are of opinion that the able, learned, and experienced local trial judge has arrived at a conclusion as fair and impartial as can be reached by a judicial tribunal. The mansion house has sufficient room to accommodate both families. The trial court's decree gives to each of the parties a home, a benefit and right provided under the will of W. M. White. Each has sufficient space to live comfortably, and enjoy the privileges of that home, if they choose to govern their

respective lives in a manner becoming to a family group in a cultured society. It is unfortunate that any portion must be assigned in common; but we are unable to find any other plan that will improve the situation and, at the same time, allow each of the parties to enjoy their rights in the mansion house. The plan can only work if the parties will respect the rights of each other. Whether they so conduct themselves depends inevitably upon the personal good taste and actions of the parties. The rights of the party offended must be protected.

We are of opinion that Orville Brown White took the mansion house and its curtilage, subject to the right of Mabel White to make a home there for the duration and to the extent prescribed by the trial court's decree, free from molestation and interference by the infant, his guardian, or their friends; that the right of Orville Brown White and Lucille White, his guardian, to make their home there is subject to the defined rights of Mabel White; and that in the event Lucille White, guardian, whose only right in the home arises from her natural and legal relationship to her son and ward, does not intend to respect or obey the decree of the trial court, she should voluntarily remove herself from the premises in question. If she does not, under such latter circumstances, voluntarily remove herself, then she should be removed by an order of the court.

The judgment of the trial court is affirmed, and this cause is remanded to the lower court, so that, if necessary, it may enter such orders and decrees as may be proper to require obedience to the terms of the decree appealed from.

*Affirmed and remanded.*