**GOOD WILL HOME ASSOCIATION**

v.

**James S. ERWIN, as Attorney General of the State of Maine.**

Supreme Judicial Court of Maine.

June 17, 1970.

Pierce, Atwood, Scribner, Allen & Mc-Kusick, by Vincent L. McKusick, and Peter L. Murray, Portland, for plaintiff.

Warren E. Winslow, Jr., Garth K. Chandler, Asst. Attys. Gen., Augusta, for defendant.

Before WILLIAMSON, C. J., and WEBBER, MARDEN, DUFRESNE, WEATHERBEE and POMEROY, JJ.

POMEROY, Justice.

This Petition for Declaratory Judgment was filed in the Superior Court, Kennebec County. That Court by agreement of counsel, then reported the cause pursuant to Rule 72 M.R.Civ.P.

Paragraph 6 of the Complaint alleges:

"In October, 1968, the Defendant informed the Plaintiff Association that he considered that its operation of The Hinckley School was *ultra vires* in that it was beyond, and not in conformity with, the corporate purposes and powers of the Plaintiff Association."

The Defendant is the Attorney General of the State of Maine. As such he is charged with the responsibility to enforce "due application of funds given or appropriated to public charities within the State and prevent breaches of trust in the administration thereof." 5 M.R.S.A. 194.

The verity of Plaintiff's assertion is established by the Defendant's Answer.

A justiciable controversy exists. LaFleur ex rel. Anderson et al. v. Frost et al., (1951) 146 Me. 270, 80 A.2d 407.

The forum chosen and the remedy sought are legally appropriate. 14 M.R.S.A. 5954.

The Plaintiff asks that we declare it is operating agreeably to the provisions of its Charter. This we cannot do.

On October 5, 1889, Good Will Home was organized pursuant to R.S.1883, c. 55, Sec. 1–4, the precursor of 13 M.R.S.A. 901 et seq.

The purposes and powers of the Association were described in the Articles of Association in these words:

"To provide a home for the reception and support of needy boys, and to attend to the physical, industrial, intellectual, moral and spiritual development of those who shall be placed in its care; its spirit to be evangelical without being sectarian.

"To acquire by purchase, gift, bequest, or in an other lawful manner real and personal estate; to construct, maintain and hold in line of perpetual succession, any building or other structure or property, and to acquire and hold in the same manner any and all property, real, personal and mixed, which may be, or hereafter become, necessary or convenient for the above described purposes."

During its entire history since that date the corporate Charter has been changed but once. In 1897 by Private & Special Laws of 1897, c. 455, provision was made that "the objects and purposes of said corporation may be enlarged to include the furnishing of aid to needy girls."

The members of the Good Will Home Association, at their annual meeting held July 27, 1897, acting under this statutory authorization enlarged the stated objectives and purposes of the Association to include needy girls as beneficiaries as well as needy boys.

Little is told us in the record of the operation of the Association in the early years of its existence. The defendant in its brief says, as a result of many policy decisions "a new course was charted." The defendant fixes the time of the charting of this new course as "in the 1950's."

We are afforded a complete description of the operations of the Association as they exist today.

Originally the physical plant in which the Plaintiff's activities were conducted consisted of many buildings, some of them cottages, located in the beautiful Kennebec Valley on the shores of the Kennebec River in the Town of Hinckley, Maine.

The Association today operates under the name, "The Hinckley School." We have been furnished various catalogs of the School, published and used during the past several years. These catalogs and other evidence in the record reveal that in addition to the buildings constituting the Association's physical plant above described, there are now many modern buildings, including a modern gymnasium and modern dormitory buildings. The School is described in the catalogs as "A College Preparatory School," the Executive Officer of which is described as "Headmaster."

In one catalog there is a photograph of several young people attired in ski togs entering a school bus. Beside the photograph the following legend appears:

"Hinckley is in the ski country, and nearly everybody takes advantage of the many opportunities available. Two instructors are on the School staff, and beginners and experts alike are shown how to get the maximum pleasure from this popular sport. The ski team competes with other private and public schools, and there are week-end trips by bus to Sugarloaf and other nearby ski areas for those who prefer recreational skiing. The hockey rink is used for informal skating as well as team play. The annual Winter Carnival is a highlight of the season, complete with dance, snow sculpture and other various athletic contests."

In all the catalogs the Hinckley School is described as "a co-educational college preparatory boarding school for approximately 160 students in grades 8 through 12."

For the academic year 1969–70 the boarding tuition was $2,800.00, which includes charges for aptitude and achievement testing and required insurance. There is a scholarship service which requires the submission of detailed confidential financial statements by parents whose children seek scholarship aid.

In 1969, 79 boys and girls received some tuition assistance. 13 received full payment; 52 over $1,200.00.

The costs per student per academic year are in excess of $4,000.00. The difference between the $2,800.00 tuition and the $4,000.-00 cost comes from donations and income from invested trust funds.

Can an institution, the activities of which are as described in the testimony of the Headmaster and the President of the Institution and in the catalogs to which reference is made above, properly be described as "providing a home for the reception and support of needy boys and girls?"

"What is a home? The word is understood by everyone but cannot be completely defined by anyone." Guilford Trust Company v. Milo Community Hospital, Me., 227 A.2d 612 at 614.

"It is impossible to formulate a comprehensive definition of the word 'home.' * * * It has many implications. It has been immortalized in song and story. Men and animals have an instinctive idea of its meaning. The toddling infant knows a yearning for the place which he conceives to be his home. Domestic animals instinctively yield to the longing to return to their abiding places." White v. White, (1944) 183 Va. 239, 31 S.E.2d 558 at 562.

"And he who gives a child a home builds palaces in Kingdom come." John Masefield, The Everlasting Mercy.

The mental attitude toward the place is an important factor in determining if a place is a home. Reardon v. Mueller, St. Louis Court of Appeals (1965); (re-hearing denied, Mo.App., 388 S.W.2d 53).

The Headmaster of The Hinckley School, while testifying, was asked to compare the living facilities at The Hinckley School with those at Tabor (a private college preparatory school where he once taught). This colloquy ensued.

"Q Why the expression 'homes-away-from homes'? Is that any different, he wants to know, than a dormitory at Tabor? Is the physical set up of cottages and dormitories at Hinckley any more of a home away from home than when you were at Tabor?

A They lived in dormitories and lived in cottages comparable to ours.

Q Any difference?

A The physical differences, there is very little physical difference."

In answer to a question asked concerning athletic competition, the Headmaster testified The Hinckley School competes, "with such private schools, independent schools, as MCI, Kents Hill, Hebron, North Yarmouth."

The students at Hinckley School remain in residence only during the academic year. At the conclusion of the academic year they return to the homes from which they came as do students in any college preparatory school, such as Hebron Academy, Kents Hill School, Tabor Academy or Philips-Exeter Academy.

Much as students often come to love the school in which they are in attendance, we cannot say that one would have the same mental attitude toward the preparatory school in which he is a student as he would that place we ordinarily refer to as his home.

We see no substantial difference between the operation of The Hinckley School, as such operation was described in various catalogs, and the operation of such well

known college preparatory schools as Hebron Academy, Tabor Academy and Philips-Exeter Academy.

Surely one would never describe Hebron Academy as a "home for boys."

One would never describe Tabor Academy as a "home for boys."

The Trustees of The Hinckley School in their catalog never described Hinckley School as a "home for boys" (and girls).

All would describe their institutions exactly as the Trustees of The Hinckley School did in their brochures: "A college preparatory school."

■ The Articles of Association of the Good Will Home Association describe the beneficiaries of its charity as needy boys and girls. We cannot say that an institution for the attendance at which there is a charge of $2,800.00 per year is being operated as a charity, the beneficiaries of which are needy boys and girls.

■ The purpose of a non-profit corporation is the object for which the corporation is formed; the aim, intention or plan which it is meant to effectuate. It is that which the incorporators set before them to accomplish; it is the raison d'etre.

■ The corporate purposes as stated in the Articles of Association serve to inform the public as to the nature of organization for the benefit of those with whom it deals. The statement also serves to inform its members as to the scope and range of its proper activities and to assure them it will not involve them in remote and uncontemplated lines of activity. See: Flaherty v. Portland Longshoremen's Benevolent Society, 99 Me. 253, 59 A. 58.

■ The charter of a corporation is the index to the powers with which the corporation has been endowed. Trico Elec. Co-op. v. Ralston, 67 Ariz. 358, 196 P.2d 470. See also: Norwegian Old Peoples' Home Soc. v. Willson, 176 Ill. 94, 52 N.E. 41.

While we are satisfied, that operation of a college preparatory school is a much needed and worthwhile activity and the trustees are well motivated, we cannot be swayed by the admirability of the cause or the generous impulses of those directing the school. See: Kubik v. American Composers Alliance, Inc., Sup., 54 N.Y.S.2d 764.

The operation of Good Will Home Association as presently conducted is ultra vires. It is our plain duty to so declare.

We must and do order the operations of the Association to be reconstituted so as to conform to the purposes described in its charter.

We realize the School has entered into contracts with teachers and has accepted pupils to whom they owe an obligation to furnish educational facilities promised. To order the School to cease operating or to precipitously change its present policies would result in unreasonable hardship to many who entered into contracts in good faith.

We direct that the Association revamp its activities so as to conform to its legal corporate purposes by June 30, 1973.

The amended Complaint asks this Court "to instruct the Plaintiff Association as to the scope of its purposes and powers under its Articles of Association."

The record before us is inadequate to provide us the necessary information with which to describe the exact activities we would consider permissible under the terms of the Articles of Association.

For this reason we are remanding the cause to the Superior Court with instructions to order proposals for future operations to be made to it by the Trustees of the Association; to consider such proposals and to issue such orders as the Court deems necessary to reconstitute the activities of the Association to conform to the limitations on its corporate activities as described in this opinion.

The entry must be, we declare the operation of The Hinckley School by the Good Will Home Association, as it is presently conducted, to be *ultra vires* and without the power of the Association.

It is ordered the Plaintiff reconstitute its activities to bring its activities into harmony with the corporate purposes on or before June 30, 1973.

The cause is remanded to the Superior Court for action consistent with this opinion.