COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:   Judges Raphael, Lorish and Callins
Argued at Lexington, Virginia


PAMELA LARSEN STACK, ET AL.

v.        Record No. 1301-22-3

SANDRA F. LARSEN

OPINION BY
JUDGE STUART A. RAPHAEL
SEPTEMBER 26, 2023


FROM THE CIRCUIT COURT OF FRANKLIN COUNTY
Timothy W. Allen, Judge

Vicki L. Francois (John S. Koehler; Justin A. Steele; Wiese Law
Firm, PLC; The Law Office of James Steele, PLLC, on briefs), for
appellants.

James J. O'Keefe (Michael S. Whitlow; MichieHamlett PLLC;
Whitlow & Youell PLC, on brief), for appellee.


Erik Larsen bequeathed a 101-acre tract of land to his adult children, Pamela Larsen

Stack and Kirk Larsen, subject to the right of his second wife, Sandra F. Larsen, "to reside in

[the] home . . . for so long as she is physically and mentally able to do so."  The will also

provided for Sandra to "receive the monthly rental payments" from a cell-tower lease on the

property.  Two years ago, our Supreme Court concluded that Erik's will "did not give Sandra a

life estate in the property" and that Pamela and Kirk (the "children") had concurrent property

rights that were limited only "'to the extent that they interfere[d] with [Sandra's] ability to live

on the property by herself.'"  *Larsen v. Stack*, 298 Va. 683, 690-91 (2020) (alterations in

original) (quoting *Stack v. Larsen*, No. CL18-2358, slip op. at 2, 2019 WL 11023850, at *2

(Franklin Cnty. Cir. Ct. Mar. 29, 2019)).

Following that decision, new disputes arose when Pamela announced that she planned to

move into the second floor of the residence, displacing Sandra from her bedroom and limiting

Sandra's occupancy to the first floor. The children also demanded that the cell-tower company send its rental payments to them for forwarding to Sandra, rather than pay Sandra directly. Sandra sued Pamela and Kirk for declaratory and injunctive relief, and the children counterclaimed seeking their own declaratory and injunctive relief.

The trial court declined the children's request to divide the residence into two apartments, concluding that apportionment was impractical and that Erik had not intended for the children to live in the house with Sandra. The court also rejected the children's request to charge Sandra rent. The court agreed, however, that the children have the right to inspect the property for waste, conditioned on 24 hours' notice to Sandra and inspection at a time mutually agreeable to the parties. The court also ruled that the cell-tower rental income must be paid directly to Sandra. Finding no reversible error, we affirm.

BACKGROUND

*A. The Property*

The material facts are undisputed. In 1972, Erik Larsen bought 101.161 acres of property on Mystic Lane, in Wirtz, Virginia. In 1976, Erik, his first wife, and their two children—Pamela and Kirk—moved into a house on the property. Pamela and Kirk lived there as children until the mid-1980's. Erik's first wife died in 2005. Erik later married Sandra, who has lived in the house for more than 15 years. Erik died in 2017. Erik's will devised the property to Pamela and Kirk, "subject to [Sandra] having the right to reside in [the] home . . . for so long as she is physically and mentally able to do so."

The residence consists of 2,541.5 square feet on two floors, plus a 1,189-square-foot unfinished basement. The first floor features a kitchen, living and dining spaces, one bedroom, and one bathroom. The second floor contains a study, two bathrooms, and three bedrooms,

including the primary bedroom. The house has only a single electric meter, thermostat, and heating and air-conditioning system.

On the second floor, Sandra uses the primary bedroom as her bedroom and the study as her office. The computer and phone lines enter the house at the study. Sandra also uses the second floor for storage. She used the first-floor bedroom for several weeks before and possibly after Erik's death, and she continues to use that bedroom in times of extreme heat or cold.[1]

Apart from the residence, the property contains a 672-square-foot mobile home and a cell tower. Erik and Sandra allowed various people to live in the mobile home, both before and after Erik's death.[2] In 2013, Erik and Sandra leased part of the property to Beacon Towers-VA L.L.C. to construct a cell tower. The cell-tower "[a]greement applies to and binds the heirs, successors, executors, administrators and assigns of the parties." Erik's will required that Sandra "receive the monthly rental payments, as provided for in the [agreement], for as long as she resides in [the house]." After Erik's death, Beacon Towers began sending its payments directly to Sandra. Pamela and Kirk report that while this appeal was pending, Beacon Towers transferred its rights and obligations under the agreement to another cellular-services provider. Neither Beacon Towers nor its successor was joined as a party below.

*B. Prior Litigation*

This is not the first lawsuit between the parties. In 2018, Pamela and Kirk sued Sandra for a declaration that Sandra had only a limited right to live in the residence, not a life estate in

---

[1] Pamela and Kirk claimed that photos taken in June 2017 and April 2018 showed that Sandra was living in the first-floor bedroom during those months. The trial court, however, made no finding about when Sandra used which bedroom, and Pamela and Kirk have not raised that issue here.

[2] After Erik's death, Sandra allowed her son to live in the mobile home over the children's objection. In October 2020, however, the circuit court enjoined Sandra from letting anyone reside on the property.

the property. *Larsen*, 298 Va. at 686. The trial court ruled largely in the children's favor. Sandra appealed, but the Supreme Court affirmed the trial court's ruling. *Id.* at 693. The Court "conclude[d] that . . . Erik's will only gave Sandra a limited right to reside on the property 'for so long as she is physically and mentally able to do so.' It did not give Sandra a life estate in the property." *Id.* at 690. The Court concluded that "Pamela and Kirk had concurrent rights to use and access the property" that "were only limited 'to the extent that they interfere[d] with [Sandra's] ability to live on the property by herself.'" *Id.* at 691 (quoting *Stack*, slip op. at 2, 2019 WL 11023850, at *2).

### C. Current Litigation

New disputes arose when Pamela and Kirk demanded that Sandra pay rent and real-estate taxes and the parties disagreed about who was responsible for securing property insurance. Pamela and Kirk claimed that the rental payments from Beacon Towers should be sent to them for delivery to Sandra, rather than being paid directly to her. Pamela also told Sandra that she planned to divide the house into two apartments and install a locking door at the top of the stairs. Pamela wanted the second floor for herself, restricting Sandra to the first floor and basement.

Sandra sued Pamela and Kirk for a declaratory judgment that she did not have to pay rent and that partitioning the house would unreasonably interfere with her right to reside there alone.[3] Sandra requested a temporary injunction prohibiting the children from installing the door while the case was pending. The trial court denied that request, however, "so long as the door that is installed does not restrict [Sandra's] ability to gain ingress and egress to the second-floor of the home, and does not impair [Sandra's] ability to use and access the entire house." Pamela and her husband then hired a contractor who installed the door.

---

[3] Sandra also requested a declaration that Pamela and Kirk had to pay the real-estate taxes and that each party was responsible for procuring whatever property insurance was desired.

The children counterclaimed. They sought approval to charge Sandra rent and an injunction prohibiting Sandra from interfering with their right to live in the house. The children requested a declaration that they could inspect the property and the house on 24 hours' notice. They also demanded that the cell-tower company send rental payments directly to them for distribution to Sandra, rather than paying Sandra directly.[4] The counterclaim did not join Beacon Towers or its successor as a party. Nor did it identify those entities in accordance with Rule 3:12(d) and explain why they were not joined.

In lieu of trial, the parties filed a joint stipulation of facts, transcripts of Sandra's and Pamela's depositions, written submissions, and various exhibits. In her deposition, Pamela admitted that the will differed from her expectations. Pamela said that Erik and Sandra both knew that Pamela intended to move back to the property, her childhood home. But Pamela admitted that she did not think that Erik had expected her to live in the house with Sandra. Pamela claimed that, because Erik "was a trusting person," he drafted the will expecting Sandra to move out a few years after his death.

After reviewing the parties' submissions, the trial court issued a letter opinion finding that Erik intended for Sandra to be able to live alone in the residence, "without his children residing with her," and that the house would need "major renovations" to accommodate "two . . . separate family units." The court issued a final order ruling that Pamela and Kirk could not divide the house into two apartments, that Sandra need not pay rent, and that "[t]he lease payments regarding the cell phone tower payable by Beacon Towers (or its successor) shall be made directly to Sandra Larsen." But the court permitted Pamela and Kirk to "periodically inspect the [r]esidence for waste as long as they give at least 24 hours' notice to Sandra . . . and it

---

[4] The children also requested a declaration that they could require Sandra to maintain insurance, an injunction prohibiting Sandra "from making any changes or repairs to the . . . property" without their approval, and an award of costs and attorney fees.

is an agreeable time for all parties." The court cautioned that Sandra's consent to an inspection could not be "unreasonably withheld under any circumstances." And the court ordered that Sandra could not interfere with the children's use of the rest of the 101-acre property.[5]

Pamela and Kirk argue that the trial court misapplied *Larsen* when it (i) declined to divide the residence into two apartments, (ii) gave Sandra exclusive, rent-free use of the residence, and (iii) restricted their inspection rights. The children also argue that the cell-tower lessee should have been ordered to send the rent payments to them for delivery to Sandra, rather than paying rent directly to Sandra.

STANDARD OF REVIEW

This case comes to us following a summary adjudication on stipulated facts. Both sides agree that the questions presented turn on the interpretation of Erik's will and on the Supreme Court's decision in *Larsen*. They also agree that the trial court exercised equitable discretion in balancing the parties' respective interests in the property in accordance with Erik's will.

Virginia appellate courts review de novo a trial court's interpretation of legal precedent. *Commonwealth v. Watson*, 297 Va. 355, 357 (2019). A trial court's interpretation of a will is also reviewed de novo. *Larsen*, 298 Va. at 688. When, as here, "[t]he trial court based its findings of fact upon stipulated facts rather than upon an ore tenus hearing," those findings, "although highly persuasive and entitled to great weight, are not binding on appeal." *Ohio Cas. Ins. Co. v. State Farm Fire & Cas. Co.*, 262 Va. 238, 240-41 (2001). Still, we "will not reverse the trial court's judgment . . . unless it is plainly wrong or without evidence to support it." *Id.* at

---

[5] The trial court also ruled that Sandra can maintain but cannot "materially change[]" the house, that Sandra must pay all real-estate taxes on the property while she lives there, and that "[n]o party is required to maintain insurance on the property . . . for the benefit of any other party." Neither side challenges those rulings.

241 (citing Code § 8.01-680). "[T]he focus of our analysis . . . is whether the stipulated facts support the trial court's judgment . . . ." *Austin v. City of Alexandria*, 265 Va. 89, 95 (2003).

Both sides sought injunctive relief against the other, thereby invoking the equitable powers of the trial judge, sitting as chancellor. Both sides also sought to assert their rights under Erik's will, which gave the parties "concurrent rights" in the property. *Larsen*, 298 Va. at 691. When parties claim "mutual rights under the same instrument, whether deed or will, in the same property, courts of equity often have jurisdiction to define and partition, or otherwise divide" the parties' interests. *Snyder v. Grandstaff*, 96 Va. 473, 482 (1898). The trial court's "exercise of discretionary authority in equity [is] reviewed under [an] abuse of discretion standard." *Lewis v. City of Alexandria*, 287 Va. 474, 481 (2014) (citing *Bentley Funding Group, L.L.C. v. SK & R Grp., L.L.C.*, 269 Va. 315, 323-24 (2005)).

ANALYSIS

We find that the trial court did not misinterpret precedent or Erik's will, that the stipulated facts support the judgment, and that the trial court did not abuse its equitable discretion in balancing the parties' concurrent rights in the property.

*A. Apportionment (Assignment of Error I(a))*

To start, the trial court did not err in refusing to divide the house into two apartments. The Supreme Court held in *Larsen* that while Pamela and Kirk have "concurrent rights to use and access the property," they cannot interfere with Sandra's right "'to live on the property by herself.'" 298 Va. at 691 (quoting *Stack*, slip op. at 2, 2019 WL 11023850, at *2). Erik's will devised the property to Pamela and Kirk, "subject to" Sandra's right to live in the house. The Court held that the will did not give Sandra a life estate or an "exclusive right to use the property." *Id.* at 690. Pamela and Kirk thus do not have *successive* rights to a remainder, but rather "*concurrent* rights to use and access the property" now. *Id.* at 691; *cf. Maitland v. Allen*,

- 7 -

267 Va. 714, 718 (2004) ("By definition, the holder of a present life estate and the holder of a future remainder interest do not own concurrent interests because each holder uses the property exclusively during her respective time of possession." (quoting *Beach v. Beach*, 74 P.3d 1, 3 (Colo. 2003))). But *Larsen* also made clear that "Sandra had the right to live on Erik's property 'free from molestation and interference.'" *Larsen*, 298 Va. at 691 (quoting *White v. White*, 183 Va. 239, 252 (1944)). Thus, the children's rights are "limited 'to the extent that they interfere[] with [Sandra's] ability to live on the property by herself.'" *Id.* (second alteration in original) (quoting *Stack*, slip op. at 2, 2019 WL 11023850, at *2).[6]

The stipulated facts support the trial court's judgment that dividing the residence into two apartments and restricting Sandra to the first floor would materially interfere with her rights. Sandra would have to move downstairs from the primary bedroom she occupies. With a shared entrance and kitchen near the first-floor bedroom and bathroom, she would lack privacy. Forcing the parties to use the kitchen and other shared space on the first floor would also be impractical given the animosity between them. The house has only a single electric meter, thermostat, and heating and air-conditioning system. And all the computer and phone lines enter the house in the second-floor office. Thus, the trial court reasonably found that "[w]ithout major renovations to the house it would not be possible for two . . . separate family units to live in this house at the same time."

Pamela and Kirk argue that the trial court should have divided the house like the chancellor did in *White*. The testator's widow in *White* shared the house with the testator's

---

[6] Erik's will gives Sandra the right to reside in the house "for so long as she is physically and mentally able to do so." The children may be correct that when the Supreme Court stated that Sandra could live "by herself," *Larsen*, 298 Va. at 691, it merely meant *without assistance*, not *alone*. We need not decide that question here. Even if the words "by herself" were removed, the stipulated facts still support the trial court's judgment that dividing the house into two apartments would interfere with Sandra's right to live in the house unmolested.

infant grandson and daughter-in-law. *White*, 183 Va. at 243. After conflict arose between the widow and daughter-in-law, the Supreme Court affirmed the chancellor's decree apportioning the house into two apartments. *Id.* at 243, 252.

To be sure, there are similarities between this case and *White*, though *White* was decided in 1944. The testator's widow in *White*, like Sandra, received a right to live in the marital home, "free from molestation and interference." *Id.* at 252. The testator's infant grandson, like Pamela and Kirk, inherited title to the property.[7] *Id.* at 250. And the house in *White*, like the one here, "did not readily lend itself to division into two apartments." *Id*. at 246. It had only one bathroom, the second floor lacked running water, and the parties had to share "hallways, staircases, porches, bathroom, water fixtures and appliances." *Id*.

Still, three considerations distinguish *White* from this case. First, the procedural posture here is materially different. The Supreme Court in *White* affirmed the chancellor's exercise of discretion to divide the parties' interests in the property. In other words, the Court did not hold that apportionment was required, only that the trial judge did not err in ordering it. Here, by contrast, the chancellor found that the house should *not* be divided. On appeal, the question is whether that was a reasonable exercise of equitable discretion in balancing the parties' "mutual rights under the same instrument." *Snyder*, 96 Va. at 482.

Second, while the chancellor in *White* determined that the house there could be split into two apartments, *White*, 183 Va. at 246-47, the trial court here determined that doing so would require "major renovations." Dividing the house that way would also conflict with Sandra's

_____

[7] The testator's will "devise[d]" the house to his son "as his share of [the testator's] real estate . . . to be held by him for his natural life [with] the remainder, after his death, [to] go to his legal heirs." *White*, 183 Va. at 242. The son died, leaving the property to the infant grandson. *Id.* at 243-44.

right, affirmed by the Supreme Court, to live in the marital home "free from molestation and interference." *Larsen*, 298 Va. at 691 (quoting *White*, 183 Va. at 252).

And third, the differing outcome here and in *White* accords with the differing intent of the testators. The testator in *White* intended for his widow to live in the house "with" his son and daughter. 183 Va. at 242.[8] Because the widow clashed with the son's family, however, the trial court concluded that apportionment was necessary to carry out the testator's intent. *Id.* at 246. Here, by contrast, Pamela conceded that Erik did *not* intend for her to live in the house with Sandra.[9] "The intention of the testator serves as the 'polar star' to guide and direct the interpretation of the will." *Larsen*, 298 Va. at 688 (quoting *Feeney v. Feeney*, 295 Va. 312, 318 (2018)). While apportionment was permissible based on the facts in *White*, the chancellor's decision here *not* to apportion was also permissible.

In short, we find no legal error in the trial court's interpretation of *Larsen* or *White*, nor any abuse of discretion in the court's determination *not* to divide the residence into two apartments.

### B. Inspection Rights (Assignment of Error I(b))

The trial court determined that Pamela and Kirk could "periodically inspect the residence for waste as long as they give at least 24 hours' notice to Sandra . . . and it is an agreeable time for all parties for such inspection." The court added that Sandra may not "unreasonably

---

[8] The will provided, "I want my wife to have a home at the mansion house with [my son], as long as she remains my widow." *White*, 183 Va. at 242. It also provided that the testator's daughter could live at the house "as long as she is single." *Id.* At one point, the widow, son, daughter, and three other family members all lived in the house. *Id.* at 242-43.

[9] Pamela's counsel objected to the deposition question preceding that concession, arguing that it "call[ed] for speculation." But the parties submitted the transcript to the trial court without requesting a ruling on the objection, and Pamela has not assigned error to the trial court's considering her concession. Thus, any objection to Pamela's admission is waived. *See* Rule 5A:20(c)(1).

- 10 -

withh[o]ld" her consent. The children appeal that ruling, arguing that, as fee-simple owners, they should be able "to enter and inspect" the residence "at any time."[10]

Here again, the trial court did not abuse its discretion in balancing the parties' "concurrent rights to access and use the property." *Larsen*, 298 Va. at 690 (uppercase altered). As the Supreme Court held in *Larsen*, Sandra has the right to live in the house "free from molestation and interference." *Id.* at 691 (quoting *White*, 183 Va. at 252). Pamela and Kirk's rights are therefore "limited 'to the extent that they interfere[] with [Sandra's] ability to live on the property by herself.'" *Id.* (second alteration in original) (quoting *Stack*, slip op. at 2, 2019 WL 11023850, at *2). The chancellor had a range of choices in balancing the parties' concurrent rights. We find no abuse of discretion in the chancellor's determination that a 24-hour notice requirement would not be enough by itself to protect Sandra's privacy. The chancellor could reasonably determine that allowing the children unfettered rights to inspect upon 24 hours' notice—at any frequency and at any time of the day or night—would interfere with Sandra's right to live in the residence unmolested, particularly given the parties' acrimonious history.

## C. Rent (Assignment of Error I(c))

We also find no error in the trial court's refusal to let the children charge rent to Sandra to live in the residence. The children argue that by giving Sandra exclusive use of the residence, the court essentially ousted them from the home, augmenting Sandra's rights and extinguishing

---

[10] Sandra argues that Pamela and Kirk invited error on this point because they asked in their counterclaim to inspect the home "upon 24 hours' advance notice" to Sandra. But the trial court gave them less than they wanted because it ordered that the inspections occur only "periodically" and at "an agreeable time for all parties." Pamela and Kirk did not request those restrictions and contemporaneously protested them. So the invited-error doctrine does not apply. *See King v. Commonwealth*, 264 Va. 576, 582 (2002) (holding the invited-error doctrine inapplicable when, "as here, the record shows that a party clearly objected to a specific ruling of the trial court to which error is assigned on appeal").

theirs.[11]  They liken themselves to tenants in common, arguing that an ousted co-tenant may be "entitled to a ratable share of the fair rental value of the property."  *Daly v. Shepherd*, 274 Va. 270, 274 (2007).

But the trial court did not alter any party's rights.  It simply applied the terms of the will as authoritatively construed in *Larsen*.  Under the will, the children's rights were always "subject to" Sandra's right to live in the residence unmolested.  The will limited the children's rights "to the extent that they interfere[d] with [Sandra's] ability to live on the property by herself." *Larsen*, 298 Va. at 691 (quoting *Stack*, slip op. at 2, 2019 WL 11023850, at *2).  The trial court's finding that the children could not exclude Sandra from the second floor of the home did not entitle the children to rent; the children had no such right to exclude her in the first place.

### D.  Cell-Tower Payments (Assignment of Error II)

After Erik's death, Beacon Towers began sending its rental payments under the cell-tower lease directly to Sandra.  The children's counterclaim asked the trial court to order that the payments be paid to them, instead, for the children to then transfer the payments to Sandra.  But the trial court disagreed that the children were entitled to that relief.  The court's letter opinion found "that it is proper for the cell tower lease payment to be made payable directly to Sandra." The final order amplified that finding into language that appears to command action by the cell-tower company, even though the company was not a party.  Paragraph 3 states: "The lease payments regarding the cell phone tower payable by Beacon Towers (or its successor) shall be made directly to Sandra."

---

[11] We disagree with Sandra that the children failed to preserve this objection in the trial court, as required by Rule 5A:18.  Pamela and Kirk objected to the trial court's order, stating that the court "erred in finding that that Sandra Larsen has no obligation to pay rent to the fee simple owners during her occupancy.  The Will did not give her the right to live on the property rent free or without cost."  We find that objection sufficient to put the trial court on notice of their objection.  *See Cherry v. Lawson Realty, Corp.*, 295 Va. 369, 374 & n.4 (2018).

We find no error of law by the trial court in interpreting Erik's will. The will devised to Sandra the right "to receive the monthly rental payments, as provided for in the [cell-tower] Agreement . . . for as long as she resides in our home." The will did not require those moneys to pass through the children's hands first.

Both sides agreed at oral argument, however, that paragraph 3 of the final order is ineffective against the cell-tower company (whether Beacon Towers or its successor), because it is not a party. "It is elementary that one is not bound by a judgment *in personam* resulting from litigation . . . to which he has not been made a party . . . ." *McCulley v. Brooks & Co. Gen. Contractors, Inc.*, 295 Va. 583, 589 (2018) (quoting *Zenith Radio Corp. v. Hazeltine Res., Inc.*, 395 U.S. 100, 110 (1969)). In other words, "since the outsider is not before the court, he cannot be bound by the judgment rendered." *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 110 (1968).

The children are responsible for having failed to join the cell-tower company as a party when they counterclaimed for a declaration that the cell-tower rent should be paid directly to them. *See* Rule 3:12(d) ("A pleading asserting a claim for relief must state the names, if known to the pleader, of any persons . . . [to be joined if feasible] who are not joined, and the reasons why they are not joined."). Even when the trial court ruled that the cell-tower rent should be paid to Sandra, the children failed to complain that the cell-tower company was not a party. The children raised that objection for the first time on appeal.

Under these circumstances, we are not inclined to erase the children's loss by vacating paragraph 3 of the final order. To be sure, the failure to join a necessary party can be raised for the first time on appeal, even by an appellate court sua sponte. *Watson v. Commonwealth*, 297 Va. 347, 353 (2019) (citing *Snavely v. Pickle*, 70 Va. (29 Gratt.) 27, 42 (1877)). But "[w]hen

faced with the absence of a necessary party, courts have discretion to continue with the existing parties." *Id.*

For instance, in *Department of Game & Inland Fisheries v. Joyce*, 147 Va. 89 (1927), the employer's insurer sought to set aside a workers' compensation award, arguing that the worker's true employer, the Commonwealth of Virginia, was a necessary party that had not been joined. *Id.* at 92-94. There, as here, the "question of proper parties was not raised [below], but . . . for the first time" on appeal. *Id.* at 92. And there, as here, the issue was raised by the appellant who had not previously complained, not by or on behalf of the absent party. *Id.* at 92-23. The Court found that the State was *not* "such an indispensable or necessary party as to justify a reversal of the award or even to justify remanding the case . . . with direction to make the State a formal party." *Id.* at 93. Because the appellant had "failed to make objection" below, it "waived the irregularity." *Id.* at 93-94.

We did something similar in *Pavlicek v. Jerabek, Inc.*, 21 Va. App. 50 (1995). The employer there appealed an attorney-fee award by the Workers' Compensation Commission from a portion of funds that benefited health-care providers. For the first time on appeal, the employer and one of the health-care providers challenged the award on the ground that the health-care providers had not been joined as necessary parties. *Id.* at 56-57. We declined to consider that argument, however, because it was "first raised on appeal." *Id.* at 57.

Like the appellants in *Joyce* and *Pavlicek*, Pamela and Kirk are not entitled to set aside the judgment for failing to join a necessary party when they waited until this appeal to raise that objection. The cell-tower company, of course, is not bound by the final order. But we see "no reason . . . to throw away a valid judgment just because it did not theoretically settle the whole controversy." *Provident Tradesmens Bank*, 390 U.S. at 116. "When it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and

- 14 -

substantial justice has been reached, no judgment shall be arrested or reversed . . . [f]or any other defect, imperfection, or omission in the record, or for any error committed on the trial." Code § 8.01-678. Applying those principles here, we decline to vacate paragraph 3 of the final order.

CONCLUSION

In short, we find no legal error by the trial court in interpreting Erik's will or the Supreme Court's decision in *Larsen*, nor any abuse of discretion in balancing the parties' concurrent interests in the property.

*Affirmed.*